Filed 3/5/14  Choy v. Guo CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CORNELIUS CHOY et al., <br><br> Plaintiffs, Cross-defendants and Appellants, <br><br> v. <br><br> SHIJUAN GUO et al., <br><br> Defendants, Cross-complainants and Respondents. | A134088 <br><br> (Alameda County <br> Super. Ct. No. HG 08419907) |

Cornelius "Tony" Choy and Yong Chun "Diana" Liu[1] were engaged to be married and, upon their separation, disputed several financial matters. Tony sued Diana and her sister-in-law, Shijuan "Lucy" Guo, upon allegations that he contributed funds to the down payment of a house purchased in the names of Diana and Lucy and that he was the rightful owner of the property. Diana and Lucy cross-complained, alleging that Tony committed fraud and breach of fiduciary duty as a real estate agent and tax preparer.

Following a bench trial, the court entered judgment in favor of Diana and Lucy. The court ordered Tony to pay Diana $40,036.70 for converting her tax refunds and retirement funds to his use and ordered him to pay Lucy $60,000 in damages for fraud in connection with the house purchase. We shall affirm the judgment.

---

[1] The parties referred to themselves by their adopted English first names at trial and in their briefing on appeal. For clarity, we follow that practice here.

**Statement of Facts**

Tony is originally from Singapore but attended high school in California. He is college educated and holds an MBA degree that was awarded in the early 1980s. Tony works as a pharmacist and is also self-employed as a licensed real estate agent and tax preparer. Tony is president of Excel Financial Management, Inc. (Excel), a corporation he founded in 1986 that is engaged in real estate and mortgage transactions.

Tony started dating Diana in early 2005. Diana was born in China and received a college degree there. She came to the United States in 1997 and works as a factory manager. In 2001, Diana and a family member bought a house in Fremont and she was living there when she met Tony. Tony testified that, in October 2005, he and Diana began living together in a bedroom Tony maintained at Excel's corporate office in Hayward. Diana testified that she continued to live in her Fremont home and spent only occasional nights at the Excel office. In the Summer of 2006, they became engaged to be married. The couple began having "lots of fights and arguments" in March 2008 and separated in October of that year. Tony and Diana became embroiled in a dispute over financial matters, including distribution of Diana's tax refunds and investment funds and ownership of a house the couple occupied during the last months of their relationship.

*Tax refunds*

Tony prepared Diana's tax returns for the tax years 2005, 2006 and 2007. The refund on her 2005 tax return was electronically deposited into her checking account. The refunds on her 2006 and 2007 refunds were electronically deposited into Excel's account. Diana testified that she did not give Tony permission to deposit her tax refunds into his corporate account. Diana said she asked Tony about the missing refunds and he admitted depositing the money into his account but promised to repay the money to her, with interest. Tony never repaid the money, which totaled $17,769.[2]

*IRA funds*

---

[2] All figures are rounded to the nearest dollar.

Diana had an individual retirement account (IRA) with Fidelity Investments. In November 2006, the account balance of $22,268 was transferred to Excel. Diana testified that she did not give permission for the transfer and did not learn of the transfer until April 2008, when Tony admitted transferring the funds. Diana said that, upon learning of the transfer, Tony assured her that he was managing the money for her but refused to give her an accounting statement. In November 2008, Diana tried to transfer her IRA account from Excel to another institution but could not access the money. Diana testified that Tony told her the IRA money "went to" Excel. Tony never gave Diana her IRA funds. At trial, Tony admitted the tax refunds and IRA funds were deposited into Excel's account but claimed the funds were Diana's contribution to the couple's living expenses.

*House purchase*

In December 2007, Tony wanted to buy a home to live in with Diana when they married. Tony made a daily study of foreclosure listings and found a house he liked in Hayward. Diana's brother and his wife were also looking for a house at the time and expressed interest in the Hayward house. Diana's brother, Yong Qiang Liu, lives in China but his wife, Lucy, and their adult daughters live locally. Lucy moved to the United States from China in 1998. She does not speak or read English and testified through an interpreter at trial. Tony testified that he decided to let Lucy and her husband buy the house and acted as their real estate agent in the transaction, with Excel as the broker.

On December 27, 2007, Lucy signed a contract to buy the Hayward house from Wells Fargo Bank for $680,000. Lucy made a $10,000 deposit on the house. Escrow was set to close in February 2008, later extended to March 2008. Lucy testified that she had never before purchased a house and did not understand the documents she signed, which were written in English. Lucy said Tony speaks Mandarin Chinese but never explained the documents to her. Lucy said she signed whatever Tony told her to sign because she trusted him.

Tony's corporation, Excel, acted as the mortgage broker to obtain financing for the Hayward house. Excel obtained a purchase money loan of $417,000 in Lucy's name. Lucy and her husband raised $130,000 as a down payment but were unable to raise the

3

entire amount needed to satisfy the purchase price of $680,000. Lucy told Tony she no longer wanted the house and was willing to lose her $10,000 deposit.

Tony told Lucy he wanted to buy the house to live in with Diana and asked her for a loan so he could buy the house. He could not raise the purchase price before the closing date without Lucy's help. Lucy agreed to proceed with the purchase with the understanding that Tony would later reimburse her and assume ownership of the house. The escrow settlement statement shows that the purchase price and closing costs were financed as follows: $417,000 mortgage loan in Lucy's name, $120,000 down payment from Lucy, $10,000 initial deposit from Lucy, and $150,000 down payment from Diana, using funds that in fact were provided by Tony. Lucy and Diana took title to the house.

The parties disagree over the exact terms of their March 2008 oral agreement concerning purchase of the house. According to Lucy, Tony promised to remove her name from the mortgage loan and repay her $130,000 plus interest within three weeks. Tony admits that he promised to repay Lucy but testified that he promised to repay the money "as fast as I can, it would be weeks or months." Tony said repayment was contingent upon Diana loaning him money from a line of credit she promised to take out on her Fremont house and Lucy transferring title to him so he could refinance the house and pay off her mortgage loan. Diana testified that she never agreed to loan money to Tony to repay Lucy and Lucy testified that she agreed to transfer title to him only after he repaid the loan and secured the release of her obligation on the mortgage.

Following the close of escrow, Tony and Diana made improvements to the house and moved into it around May 2008. The couple broke up around October 2008 and moved out of the house. Tony made mortgage payments while living at the house and, after the couple separated, Diana made the payments and continued to make them through the time of trial in June 2010. Tony never repaid Lucy's loan in full; he paid $70,000 of the $130,000 he owed.

## Procedural Background

In November 2008, Tony sued Lucy and Diana to obtain title to the Hayward house, to recover damages for breach of contract and conversion, and for rescission. Lucy

4

and Diana cross-complained against Tony and Excel for breach of fiduciary duty, fraud, conversion and constructive trust. A three-day bench trial was conducted in June 2010. An intended statement of decision was filed in October 2010 and a final statement of decision was filed in September 2011. The court made a number of factual findings in its 13-page statement of decision, among them: (1) Tony converted Diana's tax refunds and IRA funds to his own use in breach of his fiduciary duty as her tax preparer and fund manager; (2) Tony defrauded Lucy in the purchase of the Hayward house by promising to repay her "within 3 weeks and have her name removed from the mortgage if she would loan him $130,000" when he had no intention of fulfilling that promise; (3) Tony breached his fiduciary duty as Lucy's real estate agent by manipulating her into purchasing the house for his own benefit without regard to her interests; and (4) Diana and Lucy were free of wrongdoing.

In September 2011, the court entered judgment ordering Tony to pay Diana $40,037 (tax and IRA funds) and Lucy $60,000 (loan balance). While emphasizing that Tony failed to establish the requirements for imposing a constructive trust on the Hayward house, the court nevertheless gave Tony the opportunity to acquire partial ownership in an effort "to do equity" because he made a financial contribution to the purchase. The court ordered Lucy to transfer title to Tony if, within 120 days of the date of judgment, he made the necessary payment to her and obtained the lender's consent to Tony's assumption of the mortgage. The lender refused its consent, so that title remained with Lucy and Diana and Lucy remained liable on the mortgage.[3]

Tony filed a motion for new trial and to set aside the judgment. The court denied the motions and Tony and Excel filed a timely notice of appeal.

---

[3] Tony states in his appellate brief that he believes the house was subsequently sold. However, the record contains no evidence of a sale and no evidence of the terms of any possible sale.

**Discussion**

I. *The court did not err in ruling on evidentiary matters concerning Tony's conversion of Diana's IRA fund.*

It is undisputed that Diana's IRA funds were transferred to Tony's corporation, Excel, and the trial court held Tony liable for wrongfully converting the funds. The court found credible Diana's testimony that she never authorized the transfer and rejected Tony's testimony that Diana signed a form to transfer the funds as a contribution to the couple's living expenses.

On appeal, Tony contends the court erred in excluding evidence substantiating his claim that Diana authorized the transfer. Tony offered an expert witness on "the processes of transferring IRA accounts." The expert's proffered opinion was that "it would be virtually impossible" to transfer IRA funds "without a signature." During expert voir dire, the court questioned Tony's counsel on the propriety and relevance of the proffered testimony. The court observed that expert testimony on general brokerage practices was "not helpful" as the case presented a purely factual question as to whether Diana actually signed a form authorizing redemption of her IRA funds. The court said: "It's factual, so the facts are there or the facts aren't there, and I'll figure that out at the end of the trial." Tony's counsel replied, "I'm comfortable with that" and made no further effort to introduce expert testimony on the topic.

Diana argues that the court did not exclude expert testimony but simply challenged Tony to demonstrate its relevance, at which point Tony conceded its irrelevance and abandoned all effort to introduce it. In all events, assuming the court excluded the proffered testimony, exclusion was proper. " 'As a general rule, a trial court has wide discretion to admit or exclude expert testimony. [Citations.] An appellate court may not interfere with the exercise of that discretion unless it is clearly abused.' " (*People v. Valdez* (1997) 58 Cal.App.4th 494, 506.) There was no abuse of discretion here.

The proffered expert testimony on brokerage practices was largely irrelevant to the issues at trial and, to the extent relevant, was not related to a subject beyond the court's knowledge. The disputed issue was whether Diana consented to the transfer of her IRA

6

funds to Tony, as he claimed, not whether brokerage firms require a signature to redeem funds. That a financial institution requires an account holder's signature to withdraw money is not "a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact" (Evid. Code, § 801, subd. (a)) especially where, as here, the trier of fact is the court. In finding the proffered testimony irrelevant, the court never questioned that a brokerage firm would require a signature. The issues for determination were whether it was Diana who signed a transfer document and if she did so intending that Excel assume ownership of the funds. As the court rightly noted, expert testimony about brokerage practices generally would not "illuminate anything" relevant to the case.

Nor did the court err in excluding a signed IRA withdrawal form presented on the last day of trial. The document at issue is a Fidelity Investments form signed with Diana's name transferring her IRA funds as a "Distribution from a Rollover IRA to a qualified plan" with the receiving plan name listed as "Excel Financial Management Corporation."

As an initial matter, the parties on appeal disagree as to whether Tony obtained a definitive ruling excluding the document. The proceedings were not transcribed but the parties stipulated to a settled statement of the proceedings. According to that statement, Tony's attorney presented the document on the last day of trial, saying that Tony had discovered it the previous night and he wished to introduce it as part of his rebuttal case. Tony's counsel "made no motion in chambers to admit the document[], nor did the court state that it would not admit the evidence. But the court indicated that it was not going to consider the evidence in terms that were clear and strong enough to convey the sense that it was no longer contemplating the matter. 'Enough is enough,' the court stated." We accept this statement as a ruling of exclusion and turn to the merits.

The trial court "indicated that it was not inclined to consider the evidence . . . for several reasons, including its late discovery and the unfair surprise that admitting it would entail; the court also stated that the evidence could be subject to exclusion under Evidence Code section 352 because it was irrelevant to the issues that were before the court, because additional information about [Tony's] and [Diana's] financial

7

arrangements was not going to assist the court in deciding the case, and because admitting the evidence would cause the trial to be much longer than necessary."

The court did not abuse its discretion in excluding the document, which was produced late in the trial without a showing of good cause for its delayed production and was of marginal relevance. Tony wildly overstates the document's significance in calling it "a smoking gun" that proves he did not convert Diana's IRA funds. Tony proffered no evidence to authenticate the signature and, in any event, the document shows a rollover distribution from Fidelity Investments to Excel as a substituted financial institution obligated to manage the funds for Diana's benefit. The document, assuming it is authentic, shows nothing more than Excel's receipt of IRA funds in trust for Diana. In this regard, it is consistent with other evidence, including the tax return Tony prepared reporting a tax-free rollover IRA distribution. Nothing in the IRA transfer document substantiates Tony's claim that Diana redeemed her IRA fund and gave him ownership of the proceeds. The court acted properly in excluding the document. Moreover, even if wrongly excluded, the document without more contains no information that would have changed the outcome of the trial. Thus, the court did not err in denying a new trial motion that relied upon the document and Tony's declaration attesting to its late discovery.[4] "[P]rejudicial error is the basis for a new trial, and there is no discretion to grant a new trial for harmless error." (*Nazari v. Ayrapetyan* (2009) 171 Cal.App.4th 690, 694.)

II. *Substantial evidence supports the court's finding that Tony breached the fiduciary duty owed Lucy.*

The trial court found that Tony breached the fiduciary duty he owed Lucy as her real estate agent by self-dealing "in violation of his obligation to use the utmost care and to act in his client's best interest." The court concluded that Tony used "false promises to

---

[4] Tony argues that the trial court disregarded his declaration, and other declarations, under the mistaken belief that a new trial motion must be based upon the record presented at trial and not on newly discovered evidence. We do not believe the court misunderstood the available grounds for a new trial. The court did remark that it would not consider matters outside the record but that remark was made with reference to some of the additional evidence submitted with the new trial motion that the court believed may have been available during trial but was not proffered in evidence.

pressure [Lucy] into agreeing to proceed with the purchase after having asked him on several occasions to terminate the purchase. The evidence establishes that [Tony's] motive was to own the house and he used [Lucy] to try to accomplish this." The court also noted that Tony's 'failure to provide her with Chinese language documents and his failure to tell her that she would be obligated under the mortgage was both dishonest and showed a lack of integrity. [Tony's] objective was to manipulate [Lucy] into purchasing the house without regard to her express wish . . . and risks to her."

The record amply supports the court's findings. "The law imposes on a real estate agent 'the same obligation of undivided service and loyalty that it imposes on a trustee in favor of his beneficiary.' [Citations.] This relationship not only imposes upon him the duty of acting in the highest good faith towards his principal but precludes the agent from obtaining any advantage over the principal in any transaction had by virtue of his agency." (*Batson v. Strehlow* (1968) 68 Cal.2d 662, 674-675.) "Unless otherwise agreed, an agent must perform the agency solely for the benefit of the principal in matters connected with the agency. The agent cannot compete with the principal on matters connected with the agency, take part in any transaction in which the trustee has an interest adverse to the beneficiary, or undertake any other agency responsibilities adverse to the interests of the principal." (2 Miller & Starr, Cal. Real Estate (3rd ed.) § 3.25.)

The evidence shows that Lucy wished to withdraw from the transaction but Tony convinced her to proceed with the purchase so he could obtain the property for his own benefit. In doing so, Lucy made a substantial cash payment and assumed mortgage liability upon Tony's false promise that he would quickly repay her and release her from liability. His conduct constituted a clear breach of fiduciary duty.

Tony's contention that there is insufficient evidence of malfeasance is founded on his own trial testimony, disregarding Lucy's contrary testimony. The trial court, however, expressly found Tony's testimony to be "specious." "The findings of the trial court as to any disputed factual issue are binding on this court, so long as they are supported by substantial evidence." (*Arntz Builders v. City of Berkeley* (2008) 166 Cal.App.4th 276, 284.) Under the substantial evidence standard, "[w]e resolve all factual conflicts and

questions of credibility in favor of the prevailing party and indulge all reasonable inferences to support the trial court's order." (*City of Claremont v. Kruse* (2009) 177 Cal.App.4th 1153, 1180.) Lucy's testimony fully supports the trial court's conclusion that Tony breached the fiduciary duty he owed her.

Tony contends the court's conclusion was based on a finding that Lucy did not know she was signing a mortgage, which he argues is a finding without evidentiary support. At oral argument, Tony's counsel noted that Lucy's cross-complaint was premised on allegations that Tony secured a mortgage in Lucy's name and Lucy testified at trial that she understood the house loan was "under [her] name." Tony misconstrues the court's decision in characterizing the finding as determining that Lucy was wholly ignorant of the documents she signed. The court found that Lucy agreed to sign a mortgage but did so without a full understanding of the obligations and risks she was assuming. The court observed that Lucy "did not understand that the mortgage was being secured only in her name. She thought that her name would be removed within 3 weeks of closing." Lucy "was willing to extend a short term loan but did not want a long term financial commitment." The court's findings are well-supported by the evidence.

Nor did the court base its determination on the fact that Tony did not provide Lucy with closing documents in Chinese, as Tony claims on appeal. The court observed that Tony's "failure to provide her with Chinese language documents and his failure to tell her that she would be obligated under the mortgage was both dishonest and showed a lack of integrity." The observation was one among many that informed the court's determination that Tony failed to act in "the highest good faith and undivided service and loyalty" to his client. (*Field v. Century 21 Klowden-Forness Realty* (1998) 63 Cal.App.4th 18, 25.) That determination is supported by the record as a whole.

III. *Substantial evidence supports the court's finding that Tony defrauded Lucy.*

Lucy testified that Tony promised to remove her name from the Hayward house mortgage and repay her $130,000 loan within three weeks. The court found that Tony made this promise fraudulently, without any intention of performing it, because "[h]e

wanted the house and did not seem to care how he got it." Tony denies fraudulent intent, arguing that he intended to perform the promise at the time he made it.

Substantial evidence supports the court's finding of fraudulent intent. Direct evidence of a party's intent is seldom possible. The law recognizes that "fraudulent intent must often be established by circumstantial evidence." (*Tenzer v. Superscope, Inc.* (1985) 39 Cal.3d 18, 30.) "[F]raudulent intent has been inferred from such circumstances as defendant's insolvency, his hasty repudiation of the promise, his failure even to attempt performance, or his continued assurances after it was clear he would not perform." (*Ibid.*)

The circumstances here support the finding of fraudulent intent. Tony admitted that he did not "have the money . . . to close escrow" and borrowed the money from Lucy intending to repay her only "as fast as" he could in "weeks or months" and "subject" to Diana loaning him money. But Diana testified she never agreed to lend Tony money. She testified that he asked her for money, both before and after the close of escrow, and she consistently refused. This evidence supports the inference that Tony promised to repay Lucy in three weeks without intending to do so, intending only to repay her "as fast as" he could and only if he could convince Diana to lend him the money. Tony's promise was made without an intent to perform.

At oral argument, Tony's counsel insisted that Tony had the ability, and intention, to perform and that it was Lucy who obstructed performance by refusing to place title to the house in escrow, to be transferred to Tony upon his repayment of the loan, which would have enabled him to obtain his own mortgage to pay off Lucy's mortgage. But Tony testified that he did not open an escrow account until May 2008, weeks after his performance was due, and there is no evidence that he ever paid into the escrow account the funds that would have been required from him had a mortgage been obtained. The evidence is thus consistent with the court's finding that Tony did not have the means to repay Lucy within the time promised and made the promise with no intention of performing it.

Tony argues there is no fraud where there are no damages and maintains that Lucy was not damaged. Title to the house remained with Lucy and Diana and Tony contends

11

that sale of the house will net Lucy more than the unpaid balance of her loan to him and any liability resulting from assumption of the mortgage obligation. However, Lucy clearly suffered damages in loaning money to Tony that was never repaid. As discussed more fully below, there is no evidence in the record indicating that Lucy would obtain any profit on sale of the house, but it is clear that she became obligated to repay the outstanding balance on the $417,000 mortgage. Lucy also became obligated to make payments on the mortgage loan and for property insurance, property taxes, and other related expenses. While Diana paid these costs, Lucy was a joint owner subject to an action for contribution. The evidence leaves little doubt that Lucy incurred appreciable damages as a result of Tony's fraud.

IV. *The court did not err in denying Tony ownership of the house or contract rescission.*

Tony contends the court should have awarded him ownership of the house or, alternatively, rescinded the parties' contract and awarded him $260,000 for money he advanced on the down payment, his partial loan repayment to Lucy, the monthly mortgage payments that he made, and the home improvement costs that he incurred. The contention is meritless. As the trial court properly found, Lucy's oral promise to convey real property to Tony was unenforceable (Civ. Code, § 1624, subd. (a)(3)) and in all events was conditioned on Tony repaying Lucy and securing her release from liability on the mortgage. Tony also failed to demonstrate grounds for the equitable remedy of rescission. (Civ. Code, § 1689.) It would hardly be equitable to compel Lucy to pay him for his expenditures on the house he fraudulently induced her to purchase. As the trial court properly found, there is "no factual basis" for rescission.

Despite finding no grounds for rescinding the contract or imposing a constructive trust, the court nevertheless sought to "do equity" for Tony in light of the funds he did provide in the expectation of assuming ownership of the house. As indicated above, the court ordered Lucy to transfer title to Tony if, within 120 days of the date of judgment, he repaid her down payment and obtained the lender's consent to his assumption of the mortgage. Tony sought the lender's consent but it was refused. The court, upon learning of the refusal, denied Tony's request for modification of the judgment. The court was

12

willing to provide relief to Tony for his investment in the house provided Lucy was made "whole," but understandably refused to make any modification that threatened to reduce her full recovery.

Tony claims Lucy's recovery exceeded her actual damages but fails to substantiate the claim. Tony bears the burden to affirmatively establish error and to demonstrate that it resulted in a miscarriage of justice that requires reversal. (*Aguayo v. Amaro* (2013) 213 Cal.App.4th 1102, 1109; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 105-106.) Tony has failed to carry that burden. His claim of excessive damages rests on the assertion that Lucy was awarded title to a $680,000 house with a $417,000 mortgage, resulting in a $263,000 windfall. There are several factual weaknesses in the claim. First and foremost, he presented no formal appraisal of the value of the house at the time of trial. The $680,000 value Tony assigns to the house is based on its purchase price in March 2008. But the house was purchased during a "boom market," as Tony's real estate expert conceded at trial. The market "tank[ed]" shortly after the purchase, making its value at the time of trial in June 2010 questionable. Tony testified that he consulted several appraisal websites months before trial and estimated the house's value, at that time, to be in a range of the "high 300s to low 500s," which is considerably less than its $680,00 purchase price and, at the low range, less than the mortgage obligation. Moreover, Lucy was not entitled to receive all sale proceeds because title to the property was held by Lucy and Diana. Tony's assertion that Lucy received a windfall also fails to account for the mortgage payments and other costs incurred in the more than two years that elapsed between purchase of the house and the time of trial. In short, the record does not contain a property appraisal, an accounting, or any other evidence to support Tony's claim of excessive damages. There is no basis for overturning the court's damage award.

**Disposition**

The judgment is affirmed.

13

_____
Pollak, J.

We concur:

_____
McGuiness, P. J.

_____
Siggins, J.